**United States District Court**
**Eastern District of Texas**
**Beaumont Division**

| | | |
|---|---|---|
| Personal Audio, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:11-cv-00655 |
| Amazon.com, Inc. and Amazon Digital | ) | |
| Services, Inc., | ) | **Jury Trial Demanded** |
| | ) | |
| Defendants. | ) | |

## Complaint for Patent Infringement

Plaintiff Personal Audio, LLC ("Personal Audio") for its cause of action against Defendants Amazon.com, Inc. and Amazon Digital Services, Inc. (collectively "Amazon") states on knowledge and information and belief:

## Parties

1.      Personal Audio is a Texas limited liability company.

2.      Defendant Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon.com, Inc.'s registered agent for service in Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

3.      Defendant Amazon Digital Services, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington, and is a wholly owned subsidiary of Amazon.com, Inc. Amazon Digital Services, Inc.'s registered agent for service in Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

## Jurisdiction

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), in that this action arises under the federal patent statutes, 35 U.S.C. §§ 271 and 281-285.

5.      This Court has personal jurisdiction over Amazon because it has committed acts giving rise to this action within Texas and within this judicial district. The Court's exercise of jurisdiction over Amazon would not offend traditional notions of fair play and substantial justice because Amazon has established minimum contacts with the forum. For example, Amazon has committed acts of infringement in this District, by among others things, offering to sell and selling products that infringe the asserted patent, including the Kindle Fire.

## Venue

6.      Venue in the Eastern District of Texas is proper pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(b) because Amazon has committed acts within this judicial district giving rise to this action, and Amazon has and continues to conduct business in this judicial district, including one or more acts of selling, using, importing and/or offering for sale infringing products or providing service and support to Amazon's customers in this District.

7.      Venue in the Eastern District of Texas is also proper because Personal Audio is organized and governed by the limited liability company laws of Texas and is subject to taxes in Texas. Personal Audio maintains a registered agent for service of process in Texas. Personal Audio maintains office space in Beaumont, Texas, within this District, at 550 Fannin Street, Suite 500.

8.      Venue in the Eastern District of Texas is proper because this district is centrally located to resolve common issues of fact among Personal Audio and Amazon.

9.      Venue in the Eastern District of Texas is proper because of judicial economy. Judge Ron Clark presided over *Personal Audio, LLC v. Apple Inc. et al.*, Civil Action No. 9:09-CV-111 ("*Personal Audio v. Apple*"). As part of that action, the Court has construed the claims of the asserted patents in Memorandum Opinions and Orders dated December 21, 2010 (Dkt. No. 258), January 31, 2011 (Dkt. No. 292), and May 18, 2011 (Dkt. No. 358).

## Background

**Personal Audio**

10.      James Logan, the founder of Personal Audio, is a successful businessman and entrepreneur. In 1982, Logan founded MicroTouch Systems. Under Logan's stewardship, MicroTouch became a leading developer of touch screen technologies used in a variety of consumer and commercial products. When Logan founded MicroTouch, the majority of touch screens used plastic surfaces for their contact interface. MicroTouch was one of the first companies to successfully manufacture and market touch screens with glass surfaces. MicroTouch's technology became the industry standard, and was widely used in retail outlets and purchased by large companies. By the mid-1990s, MicroTouch was the world's leading supplier of touch screen technology.

11.      For fourteen years, from 1982 until 1996, Logan served as MicroTouch's chief executive officer. MicroTouch had a single employee (Logan) when Logan started the company. By 1996, under Logan's leadership, MicroTouch employed over 600 individuals and realized about $95 million in sales. In 2000, 3M purchased MicroTouch for approximately $160 million.

12.      Logan is a prolific inventor. Logan is listed as an inventor or co-inventor on no fewer than 32 United States patents. This lawsuit for patent infringement is about two of those patents.

13.     During his time at MicroTouch, Logan had to commute to work every day. Logan became frustrated with the lack of radio listening options available during his commute. This frustration gave Logan a new idea for presenting audio programs—an audio player for delivering personalized audio content based on the past listening habits or selections of an individual user.

14.     In 1996, Logan resigned as chief executive officer of MicroTouch. Thereafter he started a new company to develop, manufacture, and sell his new idea for an audio player.

15.     From 1996 until 1998, Logan served as the president of this new company. One of the first employees he hired was Daniel Goessling. Goessling is a software developer who had previously worked with Logan on developing a patented invention for pausing live television. Goessling is listed as an inventor or co-inventor on no fewer than 12 United States patents.

16.     In the spring of 1996, Logan also contacted Charles Call for the purpose of obtaining patent protection. Call is a patent attorney. Call has worked as a patent attorney for over fifty years. As a patent attorney, Call has extensive experience with computers and computer-related patents. Call has drafted over 500 United States patents. Call is also listed as an inventor or co-inventor on no fewer than 12 United States patents.

17.     By May of 1996, Call began drafting the application that became United States Patent Application No. 08/724,813 ("the '813 application"), for the purpose of obtaining patent protection for the personal audio player invention. The '813 application claimed, among other inventions, an audio player capable of receiving navigable playlists.

18.     On October 2, 1996, Call filed the '813 application with the United States Patent & Trademark Office ("PTO"). Logan, Goessling, and Call were listed as co-inventors of the '813 application.

19.     On March 6, 2001, the PTO issued United States Patent No. 6,199,076 entitled "Audio Program Player Including A Dynamic Program Selection Controller" ("the '076 patent"), a copy of which is attached as Exhibit 1.

20.     On February 13, 2001, Call filed United States Patent Application No. 09/782,546 ("the '546 application). The '546 application was a division of the previously-filed '813 application. The '546 application claimed, among other inventions, an audio player capable of downloading navigable playlists.

21.     On March 24, 2009, the PTO issued United States Patent No. 7,509,178 entitled "Audio Program Distribution and Playback System" ("the '178 patent"), a copy of which is attached as Exhibit 2.

22.     The '076 and '178 patents (collectively "the Asserted Patents") share a common specification.

23.     The '076 patent claims, among other inventions, a player that can reproduce a selection of audio program files, and is further capable of receiving a navigable playlist. The claimed player has the capability of using the received navigable playlist to allow a user to navigate among the audio files identified in the playlist during playback. Ex. 1 at 46:13-51, 47:38-48:29.

24.     The '178 patent claims, among other inventions, a player that can reproduce a selection of audio program files, and is further capable of downloading a navigable playlist. The claimed player has the capability of using the downloaded navigable playlist to allow a user to navigate among the audio files identified in the playlist during playback. Ex. 2 at 45:60-46:33, 48:1-49:5.

25.     The Asserted Patents' specification describes an audio program player in a variety of hardware configurations. These hardware configurations include "an Internet server and PC client player architecture," "PDAs," a "portable computer," and a "simplified player for mobile use." *See* Ex. 1 at 7:41-66.

26.     The Asserted Patents' specification describes several ways the player may receive data from outside the player. These ways include a "a radio or infrared link," "replaceable media," or "cellular radio, cable modem and or satellite links." *See* Ex. 1 at 7:41-8:4.

27.     The Asserted Patents' specification describes several ways the player may store data, including data received from outside the player and audio files. These ways include "high speed RAM storage and a persistent mass storage device" or "replaceable media, such as an optical disk cartridge." *See* Ex. 1 at 4:36-38, 7:63-66.

28.     The Asserted Patents' specification describes several ways that the player may reproduce audio signals in an audible form. These ways include a "sound card," "speakers," and a "headphone-out port." *See* Ex. 1 at 5:22-25.

29.     The Asserted Patents' specification describes several types of manual controls with which the player may accept control commands from a user. These ways include a "keyboard," a "touchpad," or "a small number of buttons." *See* Ex. 1 at 5:26-29, 13:49-51, 36:41-42.

30.     The Asserted Patents' specification describes that the player may be "advantageously implemented by . . . a processor." *See* Ex. 1 at 4:33-35.

31.     In addition to hardware components, the Asserted Patents disclose the use of software algorithms. These software algorithms include continuously playing audio files (Ex. 1 at 12:16-13:11; 34:28-35:44), detecting input commands (Ex. 1 at Fig. 3, steps 261, 262, 275,

and 278), skipping forward to the next audio file in a playlist sequence (Ex. 1 at 15:21-25; 34:28-35:48), restarting playback of the currently playing audio file (Ex. 1 at 15:49-59), and skipping backward to the previous audio file in a sequence (Ex. 1 at 15:49-59; 34:28-35:53).

32.     Personal Audio owns and maintains all rights to enforce the Asserted Patents.

33.     The '076 patent is a foundational patent in the portable personal audio player industry. As evidenced by a forward reference search, attached as Exhibit 3, the '076 patent has been cited in no fewer than 233 issued United States patents.

**Personal Audio's Lawsuit Against Apple Inc.**

34.     On June 25, 2009, Personal Audio sued Apple Inc. in the Eastern District of Texas for infringement of the '076 patent. Personal Audio alleged that Apple infringed the '076 and '178 patents by selling the iPod classic generations 1 through 6, iPod mini generations 1 and 2, iPod nano generations 1 through 5, iPod touch generations 1 through 3, iPhone, iPhone 3G, iPhone 3GS, and iPad.

35.     The Court, the Honorable Ron Clark presiding, held a jury trial from June 23 until July 8, 2011.

36.     During the trial Apple asserted that claims 1, 3, and 15 of the '076 patent and claims 1, 6, 13, and 14 of the '178 patent were invalid as anticipated or obvious. For each asserted claim, Apple argued that it was anticipated by the DAD486x Digital Audio Delivery System Operation Manual ("DAD Manual") and DAD486x Digital Audio Delivery System ("DAD System"). Apple also argued that each of the asserted claims was rendered obvious by various combinations of the DAD Manual, DAD System, Sound Blaster 16 User's Guide for Windows 95, Microsoft Windows 95 Resource Kit manual, "Architecting Personalized Delivery

of Multimedia Information" by S. Loeb, Musicshop Reference Manual, Sony Discman player and instructions, and Sony Minidisc player and instructions.

37.     On July 8, 2011, the jury by unanimous verdict found that Apple infringed claims 1, 3, and 15 of the '076 patent by selling the iPod classic generations 3 through 6, iPod mini generations 1 and 2, and iPod nano generations 1 through 5 in the United States. The jury awarded damages to Personal Audio in the amount of $8,000,000.00.

38.     The jury rejected all of Apple's invalidity arguments and found that claims 1, 3, and 15 of the '076 patent and claims 1, 6, 13, and 14 of the '178 patent are not anticipated or obvious.

39.     On August 30, 2011, the Court ordered final judgment in favor of Personal Audio in the amount of $8,000,000.00 in damages, $4,182,331.00 in pre-judgment interest, post-judgment interest calculated at the rate of 0.11%, and costs of court.

**The Kindle Fire**

40.     Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein.

41.     Amazon manufactures and sells tablet computers. One product that it manufactures and sells is the Kindle Fire.

42.     The Kindle Fire is an audio program player capable of playing a group of audio files, such as songs, selected by the listener. A selected group of audio files arranged in a sequence is commonly known as a playlist.

43.     A number of components facilitate the Kindle Fire's capability to reproduce a playlist of audio files. The Kindle Fire includes flash memory and random access memory ("RAM"), providing the Kindle Fire with the capability to store one or more audio files.

44.     Each audio file that the Kindle Fire is capable of storing has a beginning and an end. Each audio file that the Kindle Fire is capable of storing may be digitally compressed.

45.     The Kindle Fire has a wireless communications port. Through its wireless communications port, the Kindle Fire is capable of establishing a data communications link for downloading and receiving a plurality of audio program files and a sequencing file that specifies the playlist sequence. In particular, the Kindle Fire has the capability to initiate the download of a playlist sequencing file via a request sent by the device.

46.     As described in the Kindle Fire's user manual (attached as Exhibit 4), a user can download music files and sequencing files from his Amazon Cloud Drive to a Kindle Fire using a Wi-Fi connection. These playlists and songs can then be stored locally on the Kindle Fire device:

> You can make music stored in the cloud available offline so you can play it when you don't have connectivity (for example, on an airplane). Simply tap Cloud in your Music library, then press and hold any playlist, artist, album, or song and select the "Download" option. Your downloaded music will be available in the Device tab of your Music library for playback offline.

Ex. 4 at 12. This functionality allows a Kindle Fire to download, receive, and store audio program files and a sequencing file via a request sent by the device.

47.     Flash memory and RAM provide the Kindle Fire with the capability to store the received playlist file.

48.     The Kindle Fire music player software application has various commands to control playback of a playlist of audio files. These commands include playing a playlist; skipping forward to the next song in the playing playlist; going back to the beginning of the playing song; skipping back to the previous song in the playing playlist; and going to any song in a playing

playlist. The Kindle Fire has the capability to accept a control command from a user through its touch screen.

49.     The Kindle Fire has the capability to play a playlist of audio files in the order of the playlist sequence continuously and without entry of a control command. Hardware and software components furnish the Kindle Fire with this capability. In particular, hardware components providing this capability include the Kindle Fire's general purpose computer circuitry, and an audio codec.

50.     The Kindle Fire is a general purpose computer. The Kindle Fire is made up of a processor, a power supply, and random access memory. These components are connected via a bus that transmits signals between the various components.

51.     The Kindle Fire uses an audio codec with which to reproduce digitally compressed audio files stored by the Kindle Fire in flash memory. The Kindle Fire is capable of reproducing audio files in MP3 and AAC formats. The Kindle Fire necessarily includes an audio codec to decompress and convert audio files in digitally compressed audio file formats (such as MP3) into analog form for listening.

52.     The Kindle Fire has an audio output unit including at least a speaker.

53.     The Kindle Fire contains software algorithms to provide it with the capability to continuously play a playlist of audio files without input of a user command; detect a user command to skip forward or backward in the playing playlist sequence; respond to a command to skip forward by discontinuing playback of the playing audio file and beginning playback of the next audio file in the playlist sequence; respond to a command to go back to the beginning of the presently playing audio file; respond to a second command to skip backward by discontinuing playback of the playing audio file and beginning playback of the previous audio

file in the playlist sequence; and respond to a command to discontinuing playback and start playing any audio file in the playlist sequence.

## Count I
## Amazon's Infringement of the '076 Patent

54.     Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein.

55.     Amazon has infringed and continues to infringe the '076 patent by making, using, selling, offering for sale, and/or importing, without authority, products and services, including at least and without limitation the Kindle Fire, that embody one or more of the claims of the '076 patent, or by contributing to the infringement of the '076 patent, inducing consumers of the Kindle Fire to infringe the '076 patent, or carrying out other acts constituting infringement under 35 U.S.C. § 271(f).

56.     Amazon does not have a license or permission to use the claimed subject matter in the '076 patent.

57.     As a direct and proximate result of Amazon's infringement of the '076 patent, Personal Audio has been injured and has been caused significant financial damage.

58.     Amazon will continue to infringe the '076 patent, and thus cause irreparable injury and damage to Personal Audio, unless enjoined by this court.

## Count II
## Amazon's Infringement of the '178 Patent

59.     Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein.

60.     Amazon has infringed and continues to infringe the '178 patent by making, using, selling, offering for sale, and/or importing, without authority, products and services, including at

least and without limitation the Kindle Fire, that embody one or more of the claims of the '178 patent, or by contributing to the infringement of the '178 patent, inducing consumers of the Kindle Fire to infringe the '178 patent, or carrying out other acts constituting infringement under 35 U.S.C. § 271(f).

61.     Amazon does not have a license or permission to use the claimed subject matter in the '178 patent.

62.     As a direct and proximate result of Amazon's infringement of the '178 patent, Personal Audio has been injured and has been caused significant financial damage.

63.     Amazon will continue to infringe the '178 patent, and thus cause irreparable injury and damage to Personal Audio, unless enjoined by this court.

## Prayer for Relief

**Wherefore**, Personal Audio prays for the following relief:

1.     A declaration that Amazon has infringed the '076 and '178 patents, and is liable to Personal Audio for infringement.

2.     An award of damages adequate to compensate Personal Audio for Amazon's infringement of the '076 and '178 patents.

3.     A post-judgment equitable accounting of damages for the period of infringement of the '076 and '178 patents following the period of damages established by Personal Audio at trial.

4.     An order enjoining Amazon from infringing, inducing others to infringe, or contributing to the infringement of the '076 and '178 patents.

5.      If a permanent injunction is not granted, a judicial determination of the conditions for future infringement such as an ongoing royalty or such other relief as the Court deems appropriate.

6.      A finding that this case is exceptional pursuant to 35 U.S.C. § 285.

7.      An award of prejudgment interest, costs and disbursements, and attorney fees.

8.      Such other and further relief as the Court deems Personal Audio may be entitled to in law and equity.

## Demand for Trial by Jury

A jury trial is demanded on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.


Dated: November 22, 2011                   Respectfully submitted,

                                           By:____/s/ Charles W. Goehringer Jr._____
                                           **Robins, Kaplan, Miller & Ciresi L.L.P.**
                                           Ronald J. Schutz  (MN Bar No. 130849)
                                           (Eastern District of Texas Member)
                                           (Lead Counsel)
                                           Jake M. Holdreith (MN Bar No. 211011)
                                           (Eastern District of Texas Member)
                                           Cyrus A. Morton (MN Bar No. 287325)
                                           (Eastern District of Texas Member)
                                           David A. Prange (MN Bar No. 329976)
                                           (Eastern District of Texas Member)
                                           Patrick M. Arenz (MN Bar No. 0386537)
                                           (Eastern District of Texas Member)
                                           Daniel R. Burgess (MN Bar No. 0389976)
                                           (Eastern District of Texas Member)
                                           800 LaSalle Avenue, Suite 2800
                                           Minneapolis, Minnesota 55402
                                           Telephone: (612) 349-8500
                                           Facsimile: (612) 339-4181

E-mail:  RJSchutz@rkmc.com
          JMHoldreith@rkmc.com
          CAMorton@rkmc.com
          DAPrange@rkmc.com
          PMArenz@rkmc.com
          DRBurgess@rkmc.com

Annie Huang     (MN Bar No. 0327979)
(Eastern District of Texas Member)
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 339-4181
E-mail:     AHuang@rkmc.com

**Germer Gertz, L.L.P.**
Lawrence Louis Germer
(TX Bar # 07824000)
Charles W. Goehringer, Jr.
(TX Bar # 00793817)
550 Fannin, Suite 400
P.O. Box 4915
Beaumont, Texas 77701
Telephone: (409) 654-6700
Telecopier: (409) 835-2115
E-Mail:  llgermer@germer.com
          cwgoehringer@germer.com

**Attorneys for Plaintiff Personal Audio, LLC**